# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF
## FLORIDA TAMPA DIVISION

PROCCOR PHARMACEUTICALS, INC.,

Plaintiff,

v.                                    Case No. 8:22-cv-02227-SDM-SPF

WORLD HEALTH PRODUCTS, LLC dba GAT
SPORT and VITAMIN SHOPPE INDUSTRIES
LLC, dba THE VITAMIN SHOPPE

Defendants.

## DEFENDANTS' MOTION *IN LIMINE* AND MEMORANDUM TO PRECLUDE THE TESTIMONY OF NEIL BEATON AND MEMORANDUM IN SUPPORT

LEWIS BRISBOIS BISGAARD & SMITH LLP

*/s/ Patrick C. Campbell*
Patrick C. Campbell (*pro hac vice*)
Alexander D. MacMullan (*pro hac vice*)
550 E. Swedesford Road, Suite 270
Wayne, Pennsylvania 19087
Telephone:  (215) 977-4077
Email: patrick.campbell@lewisbrisbois.com
alexander.macmullan@lewisbrisbois.com
*Counsel for Defendants*

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................... 1

II.     FACTS .......................................................................................... 2

III.    ARGUMENT ................................................................................. 9

    A.    Standard for the Motion ................................................... 9

        1.   Admissibility of Expert Testimony ................................ 9

        2.   Royalties in a Trademark Case .................................... 10

        3.   Mr. Beaton's Opinion is Not Reliable ......................... 12

            (a)   Mr. Beaton's Opinion Is Not Reliable Because He Does Not Explain How His Experience Leads to His Conclusion that a Hypothetical Negotiation would have Determined a Per Unit Royalty of $25.00 when 1) the parties had no Prior Licensing Agreement 2) Plaintiff had Never had a per unit royalty licensing agreement and 3) the per unit royalty amount would have essentially doubled the price of the product. ..................................... 12

            (b)   Mr. Beaton's Opinion is Not Reliable Because he only addressed  One of Fifteen *Georgia Pacific* Factors-and Even that One He Got Wrong ................... 15

            (c)   Mr. Beaton's analysis is Not Reliable Because It Lacks Any Meaningful Data Analysis ........................... 15

                (i)   Mr. Beaton's Opinion is Not Reliable because He Based His Opinion on Agreements that were vastly Different from a Trademark License and he Did Not Perform any Comparability Analysis ................ 15

                (ii)   Mr. Beaton's Opinion Is Not Reliable Because He Did Not apply his Experience to the Facts and Data but Relied solely on what Mr. Krigsman, a Purely Biased Party, told him what he thought was Important. .......... 18

i

(iii) Mr. Beaton's Opinion is not Reliable Because it is Based on Inadmissible Hearsay .................................................................. 19

(iv) Mr. Beaton's Opinion is Not Reliable Because he Cherry Picks only Facts that Support Proccor's Position and Ignores Negative Facts .......................................................... 20

IV. CONCLUSION ................................................................................. 21

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A&H Sportswear Inc. v. Victoria's Secret Stores, Inc.,*
166 F.3d 197, 1999 U.S. App. LEXIS 717, 1999 WL 23441 (3d Cir. 1999) ........................................................................................................ 10

*AGSouth Genetics, LLC v. Ga. Farm Servs., LLC,*
2013 U.S. Dist. LEXIS 152708, 2013 WL 5774698 (M. D. Ga. 2013) .............. 12, 21

*In re Bextra & Celebrex Mktg. Sales Practices & Prod Liab. Litig,*
524 F. Supp. 2d 1166 (N.D. Cal. 2007) ................................................................ 17

*Chico's Fas, Inc. v. Clair,*
2015 U.S. Dist. LEXIS 71716, 2015 WL 3496003 (M. D. Fla. 2015) ...................... 12

*Corp. v. MBNA Am. Bank, N.A.,*
2003 U.S. Dist. LEXIS 28099 (N. D. Ga. 2003) ....................................................... 11

*Daubert v. Merrell Dow Pharms., Inc.,*
509 U.S. 579 (1993) ............................................................................. 1, 9, 11, 21

*Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co.,*
647 F. Supp. 3d 145, 2022 U.S. Dist. LEXIS 230852 (S. D. N. Y. 2022) ........................................................................................................ 11

*Hudgens v. Bell Helicopters/Textron,*
328 F.3d 1329 (11th Cir. 2003) ............................................................................ 13

*Indus. Eng'g & Dev. v. Static Control Components, Inc.,*
2014 U.S. Dist. LEXIS 141824 (M. D. Fla. 2014) .................................................... 20

*Kumho Tire Co., Ltd. v. Carmichael,*
526 U.S. 137 (1999) .............................................................................................. 9

*LaserDynamics, Inc. v. Quanta Computer, Inc.,*
694 F.3d 51, 2012 U.S. App. LEXIS 18441 (Fed. Cir. 2011) ................ 12, 14, 16, 17

*LeClercq v. Lockformer Co.*,
 2005 U.S. Dist. LEXIS 7602 (N. D. Ill. 2005) ............................................................ 21

*Lucent Techs., Inc. v. Gateway, Inc.*,
 580 F.3d 1301, 2009 U.S. App. LEXIS 20325 (Fed. Cir. 2009) ............................... 16

*Lumber Liquidators, Inc. v. Stone Mt. Carpet Mills*,
 2009 U.S. Dist. LEXIS 154667, 2009 WL 5876245 (E. D. Va. 2009)
 (relying on *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318
 F. Supp. 1116, 1119, 1970 U.S. Dist. LEXIS 11541, *6 (S. D. N. Y.
 1970)) ................................................................................................................... 10, 15

*Perry v. United States*,
 755 F.2d 888 (11th Cir. 1985) .................................................................................... 18

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
 326 F.3d 1333, 2003 U.S. App. LEXIS 6946 (11th Cir. 2003) ................................. 13

*Tubular Rollers, LLC v. Maximus Oilfield Prods., LLC*,
 2021 U.S. Dist. LEXIS 240688, 2021 WL 5991744 (S. D. Tex. 2021) .................... 19

*Uniloc USA, Inc. v. Microsoft Corp.*,
 632 F.3d 1292, 2011 U.S. App. LEXIS 11 (Fed, Cir. 2011) ............................... 15, 16

*United States v. Frazier*,
 387 F.3d 1244, 2004 U.S. App. LEXIS 21503 (11th Cir. 2004) ......................... 12, 13

*Unleashed Magazine, Inc. v. Orange County*,
 2008 U.S. Dist. LEXIS 113383 (M.D. Fla. 2008) .................................................. 9, 12

*W.L. Gore & Assocs. v. C.R. Bard, Inc.*,
 2015 U.S. Dist. LEXIS 194112, 2015 WL 12731924 (D. Del. 2015) ....................... 18

*WhereverTV, Inc. v. Comcast Cable Communs., LLC*,
 2022 U.S. Dist. LEXIS 159537, 2022 WL 4017049 (M. D. Fla. 2022) .................... 16

**Statutes**

Lanham Act ........................................................................................................................ 11

Unlike the Patent Act ........................................................................................................ 11

**Other Authorities**

F. R. E. 703 ......................................................................................................... 19

Federal Rule of Evidence 702 ........................................................... 9, 13, 18

LOCAL RULE 3.01(g) ...................................................................................... 23

Report, Schedule 5. Report, ¶ 27 ................................................................ 5

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF
## FLORIDA TAMPA DIVISION

PROCCOR PHARMACEUTICALS, INC.,

Plaintiff,

v.                                          Case No. 8:22-cv-02227-SDM-SPF

WORLD HEALTH PRODUCTS, LLC dba GAT
SPORT and VITAMIN SHOPPE INDUSTRIES
LLC, dba THE VITAMIN SHOPPE

Defendants.

## DEFENDANTS'  MOTION *IN LIMINE* AND MEMORANDUM TO PRECLUDE THE TESTIMONY OF NEIL BEATON

Defendants, World Health Products, LLC ("GAT") and Vitamin Shoppe Industries, LLC ("TVS"), hereby file this *Daubert* Motion to Exclude Neil Beaton and move this Court to enter an Order precluding Plaintiff from offering at trial the expert testimony and opinions proffered by Neil Beaton and in support thereof, state as follows:

## I.      INTRODUCTION

Plaintiff's Proccor Pharmaceuticals, Inc. ("Plaintiff") is planning to use an expert, Neil Beaton, ("Mr. Beaton), to testify about the royalty rate that would have been arrived at pursuant to a hypothetical negotiation with Defendant GAT in September 2020. Mr. Beaton's methodology and opinion are unreliable and he should not be permitted to testify for at least the following 9 reasons:  1) there is

no prior trademark licensing agreement between the parties 2) Plaintiff has never had a trademark licensing agreement with any party 3) Mr. Beaton's analysis is based on litigation or prelitigation agreements that are vastly different from trademark licensing agreements 4) Mr. Beaton only addressed one of the applicable fifteen factors for determining what the royalty would have been had there been a hypothetical negotiation 5) Mr. Beaton never actually reviewed any of the alleged agreements that he relied on for data points in his analysis-all information in his analysis was supplied verbally by Plaintiff's CEO 6) Mr. Beaton's proposed per unit royalty rate ignores that it doubles the price of the product  7) Mr. Beaton's damages are over 35 times greater than any amounts Proccor ever earned from litigation and prelitigation settlements-combined 8) Mr. Beaton did no comparability analysis between his hypothetical trademark license agreement and the litigation and prelitigation settlements he relied on and/or 9) Mr. Beaton relies on inadmissible hearsay

## II.    FACTS

This is a trademark infringement case. Plaintiff has a trademark for the phrase "Freedom Pop". Defendant GAT used that phrase to describe the flavor for one of its products. A copy of one of the labels depicting the use of the phrase by Defendant is below.



Plaintiff has retained Mr. Beaton as a damage expert. Mr. Beaton is to testify as to his opinion as to the royalty the parties would have arrived at if they had engaged in hypothetical licensing agreement negotiations. Mr. Beaton's report is attached as Exhibit A (the "Report"). According to Mr. Beaton's hypothetical negotiation, the per unit royalty would have been $25.00 and the total royalties due are $1,065,950.00. The Report, ¶¶ 3 & 7. The royalties are calculated based on

an effective date for a hypothetical licensing agreement of September 20, 2020. The Report, ¶ 20.

Defendants contend, among other things, that there is no infringement because, among other things, the applicability of the fair use defense. Mr. Beaton assumes liability for the purposes of his opinion. The Report, ¶ 3. Defendants have filed a motion for summary judgment.

Mr. Beaton has not calculated or even addressed the profits from Defendants' sale of allegedly infringing product. The Report, ¶¶ 22-24.

He has, however, assumed GAT had gross revenues of $596,366.00 on the sale of 24,454 units (the Report, schedule 2) and GAT's customer, TVS had gross revenues of $571,385.00 on the sale of 18,184 units (the Report, schedule 3). *Ergo*, Mr. Beaton is assuming an average, per unit, sale price for GATs and TVS of $24.39 and $31.42, respectively. Mr. Beaton's $25.00/unit royalty therefore is 102% of the assumed GAT sale price and 80% of the TVS assumed sale price.

The sole basis for his opinion that hypothetical royalties are the proper measure of damages here is that he was advised by Plaintiff's CEO, Ross Krigsman ("Mr. Krigsman") that Plaintiff would have wanted a per unit royalty of $25.00 (according to pleadings) and has allegedly sought licenses from third parties who allegedly infringed. The Report, ¶ 25. The methodology he employs to arrive at his hypothetical royalty is based on information regarding data supplied to him

verbally by Mr. Krigsman about so-called "past licensing efforts". The Report, ¶ 26.[1] Mr. Beaton did not actually independently review any of the so-called licensing data, or even contracts. E.g., The Report, ¶ 27 ("I have discussed each of these agreements with Mr. Krigsman...")

Mr. Beaton's analysis is based overwhelmingly on settlement agreements in lawsuits or threatened lawsuits that contain zero or small up front settlement payments and agreements to allow the alleged infringer to sell out its product. Report, Schedule 5.  Report, ¶ 27.

Mr. Beaton does not explain why there was no such agreement or even negotiations or discussions regarding an agreement, with either Defendant here. In fact, it is undisputed that GAT responded to Proccor's cease and desist by changing the name of the product. See, Declaration of Jay Klein at 3-8, a true and correct copy of which is attached as Exhibit B. TVS did not receive a cease-and-desist until later in December 2020. The TVS response was to return any allegedly infringing product that was in distribution centers to GAT. TVS ordered its stores

---

[1] Mr. Beaton claims he was not provided information on Defendants' royalties, paid or received. Which assumes that there are such payments when, except in one limited, non-applicable scenario, there are none. In any event, his opinion is based solely on licensing data supplied by Plaintiff's CEO.

to destroy any allegedly infringing product that was on shelves.[2] Any pending sales orders were canceled. See, the Transcript of the Deposition of Thomas Matura (TVS' Corporate Designee), pp. 47-62, a true and correct copy of which is attached as Exhibit C.

A few observations about Mr. Beaton's schedule 5. First, the schedule has a total of 11 agreements or data points-ten of which are litigation or prelitigation settlements. The lone agreement that, according to the schedule at least-because they have not been produced- is an agreement with a company called "Alpha Lion" to allow it to use the word "freedom" in a juice product-in exchange, literally, for cans of juice.[3]

Assuming a settlement agreement is a licensing agreement-and it is not-Mr. Beaton relies on 10 such agreements for his analysis. The total of all monies Proccor has received through the present for all those agreements combined is $28,750.00. Mr. Beaton's hypothetical royalty amount here is 35 times what Proccor has received in the past for all its settlements.

---

[2] Admittedly some units were sold after the destruction order was given but it was probably just an oversight. *Id.* There is no evidence that it was deliberate.

[3] The EgoPharma agreement is mislabeled as a "Trademark License Agreement". From the little information we have about it, it was in exchange for a release from "past infringement", had an up-front cash payment and had no per unity royalty.

None of the litigation or prelitigation settlement agreements provide for royalties. Mr. Beaton used up front cash settlement payments for "past infringement" as the basis for implying a per unit royalty for future sell out rights. He offers no explanation for how a payment that parties agreed was in exchange for a release of past infringement can *also* be used to calculate future royalties for sell out rights. At the very least, his denominator would have to be increased to include past sales-but it was not.

Limiting the time period to September 20, 2020, the effective date of the hypothetical licensing agreement, there were only 3 agreements in existence as of that date. Two of those agreements are identified as "Cease and Desist Agreements" (i.e., prelitigation settlements). Neither of those agreements had any payments and both provided for sell-out rights.

The only other agreement was an agreement with a juice company to allow it to use the term "Freedom Juice" in connection with the sale of juice. As compensation, Proccor received 750 units of the Freedom Juice. According to Mr. Beaton, Mr. Krigsman told him Proccor sold each unit for $40.00 from which Mr. Krigsman told Mr. Beaton Proccor made $25-30. There was no royalty payment, but Beaton implies one based on what he said was an agreement Proccor had to allow the juice company sell 1000 units as Freedom Juice. Mr. Beaton implies a royalty of $18.75/unit for the 1000 units the juice company allegedly sold.

After September 20, 2020, Proccor shows eight agreements. They all have to do with litigation or pre-litigation settlements. They all, with one exception, involve past infringements and an agreement to sell-out product ((25 x 750)/1000 = 18.75).

The EgoPharma agreement (dated October 1, 2021) was with a retailer. The consideration was the retailer's distribution of Proccor's product through its distribution channel.

Five of the post September 20, 2020, agreements had up-front cash settlement payments between $3,750 and $7,500. Three agreements had no upfront payment.

With the exception of EgoPharma, and the juice company, the reported future sales permitted under the sellout provisions in the Proccor agreements Beaton relied on is no more than 200 units. Some of the agreements (Blackmarket, Kodiak, MTS, Evlution and InnovPharm) have **no** reported future sales at all. By contrast, the total unit sales Mr. Beaton relies on to calculate damages is here is 42,638 which is over 200 times higher than any other agreement to which Proccor was a party. The Report, schedules 2 & 3.

### III.     ARGUMENT

#### A.     Standard for the Motion

##### 1.     Admissibility of Expert Testimony

Expert testimony is governed by Federal Rule of Evidence 702 which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principals and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The trial court is tasked with acting as gatekeeper to ensure that any expert testimony is both reliable and relevant. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999); and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The party offering the expert has the burden to show that her expert is qualified to testify competently regarding the matters he intended to address; the methodology by which the expert reached his conclusions is sufficiently reliable; and the testimony will assist the trier of fact.'" *Unleashed Magazine, Inc. v. Orange County,* 2008 U.S. Dist. LEXIS 113383, *23-24 (M.D. Fla. 2008), adopted by 2008 U.S. Dist. LEXIS 69926 (M.D. Fla. 2008) (quoting *Maiz v. Virani*, 253 F.3d 641, 664 (11th Cir. 2001)).

## 2.    Royalties in a Trademark Case

In order to obtain damages in the form of hypothetical licensing royalties in a trademark case, the courts that permit such a recovery[4] apply the 15 factors laid out under patent cases. These factors include (1) the royalty rates received in prior licenses by the licensor, (2) prior rates paid by the licensee, (3) the nature and scope of the license, (4) the licensor's licensing policies, (5) the commercial relationship between the licensor and licensee, (6) special value of the mark to the infringer, (7) duration of the trademark and terms of the license, (8) the established profitability of the trademark licensed, (9) the utility and advantages of the trademark over prior marks, (10) benefits to those who have used the trademark, (11) the extent to which the infringer has used the mark, (12) reasonable royalties within the industry, (13) the portion of the reasonable profit that should be credited to the infringed trademark, as distinguished from non-trademarked elements, business risks, or significant features or improvements added by the infringer, (14) the opinion testimony of qualified experts, and, (15) the amount that a licensor and a licensee would have agreed upon as a reasonable royalty in a hypothetical voluntary negotiation at the time the infringement began. *Lumber Liquidators, Inc.*

---

[4] Many Courts do not even permit a royalty measure of damages where, as here, there is no prior licensing activity between the parties. *E.g., A&H Sportswear Inc. v. Victoria's Secret Stores, Inc.,* 166 F.3d 197, 208-209, 1999 U.S. App. LEXIS 717, *37-39, 1999 WL 23441 (3d Cir. 1999).

*v. Stone Mt. Carpet Mills,* 2009 U.S. Dist. LEXIS 154667, *6, 2009 WL 5876245 (E. D. Va. 2009) (relying on *Georgia-Pacific Corp. v. United States Plywood Corp.,* 318 F. Supp. 1116, 1119, 1970 U.S. Dist. LEXIS 11541, *6 (S. D. N. Y. 1970)).   Unlike the Patent Act, however, the Lanham Act does not expressly provide for a reasonable royalty remedy.   It falls under "actual damages." *Gucci Am., Inc.* v. *Guess? Inc.*, 858 F. Supp. 2d 250, 253 (S.D.N.Y. 2012). ***However, absent an existing prior licensing agreement between the parties, such damages are considered obviously and inherently speculative.*** See,  e.g., *Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co.*, 647 F. Supp. 3d 145, 233, 2022 U.S. Dist. LEXIS 230852, *140 (S. D. N. Y. 2022)(citing cases for the proposition that  courts often decline to award such damages unless the parties had a prior licensing agreement)[5]; and *Quantum* Capital *Corp. v. MBNA Am. Bank, N.A.*, 2003 U.S. Dist. LEXIS 28099, *8-9 (N. D. Ga. 2003)("The Plaintiffs are not entitled to an award of damages based upon a hypothetical and entirely speculative royalty when they do not normally license their  mark.")(citing *Ramada Inns. Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1565 (11th Cir. 1986). At minimum, to be admissible under *Daubert*, an expert's reasonable royalty calculation must tie a reasonable royalty base to the

---

[5] There is not, and never has been a licensing agreement between Plaintiff and GAT. There has never even been licensing discussions between them. There is also no history of trademark licensing by Plaintiff. That brings Plaintiff's royalty claim into the realm of pure speculation.

facts of the case at issue. See, *Chico's Fas, Inc. v. Clair*, 2015 U.S. Dist. LEXIS 71716, *15, 2015 WL 3496003 (M. D. Fla. 2015).

The *Georgia-Pacific* factors have been accepted as "valid and important factors in the determination of a reasonable royalty rate." *AGSouth Genetics, LLC v. Ga. Farm Servs., LLC,* 2013 U.S. Dist. LEXIS 152708, *10, 2013 WL 5774698 (M. D. Ga. 2013)(quoting *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317, 2011 U.S. App. LEXIS 11, *64 (Fed, Cir. 2011)). Just because the negotiation is hypothetical, does not mean the royalty rate can be created out of whole cloth. The purpose of the hypothetical negotiation framework is to ensure that the reasonable royalty rate reflects the economic demand for what is licensed-which is entirely lacking here. See, *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77, 2012 U.S. App. LEXIS 18441, *65 (Fed. Cir. 2011).

### 3.   Mr. Beaton's Opinion is Not Reliable

**(a)   Mr. Beaton's Opinion Is Not Reliable Because He Does Not Explain How His Experience Leads to His Conclusion that a Hypothetical Negotiation would have Determined a Per Unit Royalty of $25.00 when 1) the parties had no Prior Licensing Agreement 2) Plaintiff had Never had a per unit royalty licensing agreement and 3) the per unit royalty amount would have essentially doubled the price of the product.**

Where, as here, the expert testimony is based on the expert's so-called experience in a particular field, the opinions must still be reliable. *Unleashed Magazine,* supra at 25-27 (relying on *United States v. Frazier*, 387 F.3d 1244, 1261,

2004 U.S. App. LEXIS 21503, *__ (11th Cir. 2004)). In other words, just because one has experience in a particular field and is thus an expert in that field, does not make his proffered opinion reliable. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1342, 2003 U.S. App. LEXIS 6946 (11th Cir. 2003)) reh'g den. by 73 Fed. Appx. 389, 2003 U.S. App. LEXIS 18426 (11th Cir. 2003)("Yet our caselaw plainly establishes that one may be considered an expert but still offer unreliable testimony.") The witness must explain how his experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. *United States v. Frazier*, supra at 1261, 2004 U.S. App. LEXIS 21503, *40 (relying on Fed. R. Evid. 702 advisory committee's note (2000 amends.)) Reliability cannot be established merely by the *ipse dixit* of an admittedly qualified expert. *Id.*; *see also Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1344 (11th Cir. 2003) ("[A]n expert's failure to explain the basis for an important inference mandates exclusion of his or her opinion.").

If there was ever a case of an opinion being based on the *ipse dixit* of the expert, this is it. There is no explanation how Mr. Beaton's experience leads to his opinion on the per unit royalty that would have resulted from a hypothetical negotiation. In fact, Mr. Beaton's credentials are set forth at length in the Report at p. 5. The only experience he has in determining royalties is in litigation as an expert. *Id.* at p. 6. In other words, in his day job, he has never had occasion to

13

negotiate the per unit value of a trademarked phrase based on market demand. This, of course, explains how he could have an opinion of a hypothetical per unit royalty that doubles the price of the product—*without any justification*. Mr. Beaton fails to even address how the consumer demand for that product could bear such a price increase or how little both Defendants thought of the phrase that rather than license it, they discontinued its use. Mr. Beaton's hypothesis is based on pure *ipse dixit*.

As set forth above, the task at hand is to determine the royalty rate the trademarked phrase based on economic demand. See, *LaserDynamics, Inc. v. Quanta Computer,* Inc., supra at 65. Mr. Beaton does not explain how anything he did or does in his day job is a basis for him to do that. Instead, he admits that he started with what Mr. Krigsman said he wanted in pleadings then backed into that number by relying on litigation or prelitigation settlements that were vastly different in many ways. Importantly, they mostly arise in a different context (litigation or pre litigation or access to distribution channels). None of them provide for a negotiated per unit royalty. And all amounts obtained to date, on all agreements involving third parties and the phrase "Freedom Pop" amount to no more than $28,750.00 (from 11 different agreements) compared to the $1,065,950.00 he hypothesizes is due here because if the alleged market demand for the phrase "Freedom Pop". This is whole cloth.

14

**(b)   Mr. Beaton's Opinion is Not Reliable Because he only addressed  One of Fifteen *Georgia Pacific* Factors-and Even that One He Got Wrong**

Mr. Beaton relied on one of the *Georgia Pacific* factors-the royalty rates received in alleged prior licenses by the licensor. While the analysis may not require that all factors be addressed, one is entirely insufficient. This is especially so where there is no prior licensing arrangement between the parties and Mr. Beaton argues for the upward end of the alleged licensing scale.  See generally, *Lumber Liquidators, Inc. v. Stone Mt. Carpet Mills,* supra at 12, 2009 WL 5876245 (expert precluded where he relied on scant data and only 3 of the 15 factors).

Further, even as to that one factor-Mr. Beaton got it wrong. There is no past licensing activity under *Georgia Pacific*. There was no agreement with GAT and there is no actual licensing agreement with any other party. Every other agreement is either a litigation or pre-litigation settlement agreement or some form of distribution agreement. Factor one, therefore, is misapplied.

**(c)   Mr. Beaton's analysis is Not Reliable Because It Lacks Any Meaningful Data Analysis**

**(i)   Mr. Beaton's Opinion is Not Reliable because He Based His Opinion on Agreements that were vastly Different from a Trademark License and he Did Not Perform any Comparability Analysis**

For a damages expert to rely on a prior license, "there must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case." *Uniloc USA, Inc. v. Microsoft Corp.*, supra at 1317,

2011 U.S. App. LEXIS 11, *1. Licenses relied on to prove the hypothetical royalty must be sufficiently comparable to the hypothetical license at issue. *Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1324, 2009 U.S. App. LEXIS 20325, *51 (Fed. Cir. 2009). "Assessing the comparability of licenses requires a consideration of whether the license at issue involves comparable technology, is economically comparable, and arises under comparable circumstances as the hypothetical negotiation." *WhereverTV, Inc. v. Comcast Cable Communs., LLC,* 2022 U.S. Dist. LEXIS 159537, *31, 2022 WL 4017049 (M. D. Fla. 2022).

First, Mr. Beaton admits he needs to do a comparability analysis but never does it:

> This method of basing a reasonable royalty on the parties' previous licensing history, as may be adjusted for differences between prior agreements and a hypothetical agreement between the parties, is, in my experience, the most indicative measure of a reasonable royalty at which Proccor would license the trademark to Defendants.

The Report, ¶ 26.

Second, the overwhelming majority (90%) of agreements Mr. Beaton relies on are litigation or prelitigation settlement agreements. There is a longstanding disapproval of using settlement agreements in comparability analysis. *LaserDynamics, Inc. v. Quanta Computer, Inc.,* supra at 77-78, 2012 U.S. App. LEXIS 18441, *64-67 (Fed. Cir. 2012). Because of the coercive nature of litigation or threatened litigation, they reflect inflated royalties tied to risk avoidance-not the market value of the licensed material. *Id.* They are generally not probative and

highly prejudicial. *Id.*  Mr. Beaton makes no effort to explain how, in his alleged "experience", any of these litigation or prelitigation settlement agreements predict the economic demand to license the phrase "Freedom Pop" in the supplements market.

Third, the lone allegedly (we don't actually know any context for this or any agreement because they have not been produced) non settlement agreement relied on by Beaton, was for an exchange of 750 units of juice. This is hardly comparable to a trademark license agreement for a $25.00/per unit royalty rate for a product that sells for less than $25.00/unit.

In fact, Mr. Beaton admits that he did not determine the economic demand for licensing "Freedom Pop" in the supplements market. Instead, he started with what Mr. Krigsman said he wanted in his pleadings as a royalty then said he used the data (i.e., the settlement agreements) to back into it.  Report, ¶¶ 28-29:

One of many problems with starting with what the client wants and then using the data to support to is that it misses the mark. The hypothetical license negotiation is designed to arrive at what the economic demand for the trademark would have been on the date of the alleged infringement. Starting with what the plaintiff said he would have wanted, especially where plaintiff was generally adverse to licensing, as were the alleged infringers, strays from the correct methodology. *In re Bextra & Celebrex Mktg. Sales Practices & Prod Liab. Litig*, 524 F.

Supp. 2d 1166, 1176 (N.D. Cal. 2007) (excluding expert's testimony where expert "reache[d] his opinion by first identifying his conclusion . . . and then cherry-picking observational studies that support his conclusion and rejecting or ignoring the great weight of the evidence that contradicts his conclusion."); and see *Perry v. United States*, 755 F.2d 888, 892 (11th Cir. 1985) (an expert who has a formed an opinion as to the answer he is going to find before he even begins his research may be less objective than he needs to be in order to produce reliable.")

          (ii)    **Mr. Beaton's Opinion Is Not Reliable Because He Did Not apply his Experience to the Facts and Data but Relied solely on what Mr. Krigsman, a Purely Biased Party, told him what he thought was Important.**

Mr. Beaton's views must obviously be formed based on his own experience and knowledge. United States v. Frazier, supra at 1261, 2004 U.S. App. LEXIS 21503, *40 (relying on Fed. R. Evid. 702 advisory committee's note (2000 amends.))("the witness must explain how his experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. "). Here, Mr. Beaton relies solely on what Mr. Krigsman, a party with a bias, to cherry pick what he likes about each alleged agreement-namely the compensation-and pass that on to him. This is highly improper. *W.L. Gore & Assocs. v. C.R. Bard, Inc.,* 2015 U.S. Dist. LEXIS 194112, *17,

2015 WL 12731924 (D. Del. 2015)(expert's comparability analysis does not "fit" the facts of the case where it was not based on her own reading of the patent but, rather, what another person told her.)

### (iii)   Mr. Beaton's Opinion is not Reliable Because it is Based on Inadmissible Hearsay

While F. R. E. 703 may permit experts to rely on hearsay, it is only when the hearsay is of the type normally relied upon by experts in the field. See, *Tubular Rollers, LLC v. Maximus Oilfield Prods., LLC*, 2021 U.S. Dist. LEXIS 240688, *5, 2021 WL 5991744 (S. D. Tex. 2021). *Tubular* was a patent infringement case. The expert was asked for an infringement opinion based on the use of the product in the field. The product's use in the field was determined from a video. The problem was the expert did not view the video. An employee for the party viewed the video and described it to the expert. The expert's opinion there was excluded. The Court stated:

> Neither party has suggested that this kind of hearsay is the kind of information that engineers normally rely upon while performing their day jobs. The Court, therefore, excludes all evidence based solely upon Dr. Wooley's reliance on Henkes' viewing of a video purporting to be Maximus' product. It might be 'a different story if Dr. Wooley had actually taken the trouble to view the film himself but relying on a third person to watch the video and tell him what was in it goes way beyond the boundaries of Federal Rule of Evidence 703.

*Id*.

Mr. Beaton offers no explanation for why he did not look at the agreements himself. He makes no argument that in performing his day job, he or anyone else in his profession would look only to data supplied, by word of mouth, by the biased client. That sounds of professional negligence at least.

The data points, the terms of the agreements Mr. Krigsman supplied to Mr. Beaton, are not admissible. They are double hearsay.  See, *Indus. Eng'g & Dev. v. Static Control Components, Inc.*, 2014 U.S. Dist. LEXIS 141824, *7 (M. D. Fla. 2014)(while expert may be able to rely on hearsay, expert cannot testify as to inadmissible hearsay under the guise that his opinions are based on such inadmissible evidence.) Mr. Beaton's opinion, therefore, is inadmissible.

Further, the agreements themselves have never been produced. There is no way to explore, let alone cross examine Beaton or even Krigsman on the content of the agreements.

>       **(iv)    Mr. Beaton's Opinion is Not Reliable Because he Cherry Picks only Facts that Support Proccor's Position and Ignores Negative Facts**

There is also another equally important problem here. The royalty rate essentially equals the price of the product. The royalty would, therefore, double the price.

Mr. Beaton gave no consideration to how anyone would have continued to buy Freedom Pop flavored Nitraflex if the price **doubled**. Again, it highlights the fundamental flaw in Mr. Beaton's attempt to justify what Mr. Krigsman asked for as opposed to what a willing licensor and licensee would have arrived at in a negotiation in September 2020.

At minimum, to be admissible under *Daubert*, an expert's reasonable royalty calculation must "tie a reasonable royalty base to the facts of the case at issue." *AGSouth Genetics, LLC v. Ga. Farm* Servs., *LLC,* 2013 U.S. Dist. LEXIS 152708, *10, 2013 WL 5774698 (M. D. Ga. 2013). That has not been done here. Mr. Beaton has ignored negative facts.  This alone is a basis to exclude the testimony. *LeClercq v. Lockformer Co.,* 2005 U.S. Dist. LEXIS 7602, *15 (N. D. Ill. 2005)( granting motion *in limine* under Daubert where expert failed to address or discuss the import of negative facts because selective discussion of facts is cherry picking.)

## IV.   CONCLUSION

Mr. Beaton's methodology and opinion are unreliable and he should not be permitted to testify for at least the following 9 reasons:  1) there is no prior trademark licensing agreement between the parties 2) Plaintiff has never had a trademark licensing agreement with any party 3) Mr. Beaton's analysis is based on litigation or prelitigation agreements that are vastly different from trademark licensing agreements 4) Mr. Beaton only addressed one of the applicable fifteen

21

factors for determining what the royalty would have been had there been a hypothetical negotiation 5) Mr. Beaton never actually reviewed any of the alleged agreements that he relied on for data points in his analysis-all information in his analysis was supplied verbally by Plaintiff's CEO 6) Mr. Beaton's proposed per unit royalty rate ignores that it doubles the price of the product  7) Mr. Beaton's damages are over 200 times greater than any amounts  Proccor ever earned from litigation and prelitigation settlements-combined 8) Mr. Beaton did no comparability analysis between his hypothetical trademark license agreement and the litigation and prelitigation settlements he relied on and/or 9) Mr. Beaton relies on inadmissible hearsay.

Defendants, therefore, request that this Court enter an Order precluding Plaintiff from offering at trial the expert testimony and opinions proffered by Neil Beaton.

## <u>LOCAL RULE 3.01(g) CERTIFICATION</u>

I certify that I conferred by with counsel for the Plaintiff, G. Donovan Conwell, Jr., regarding the relief sought in this motion and that the relief requested herein is opposed.

Respectfully Submitted,

LEWIS BRISBOIS BISGAARD & SMITH LLP

/s/ Patrick C. Campbell
Patrick C. Campbell (*pro hac vice*)
Alexander D. MacMullan (*pro hac vice*)
550 E. Swedesford Road, Suite 270
Wayne, Pennsylvania 19087
Telephone:  (215) 977-4077
Email: patrick.campbell@lewisbrisbois.com
alexander.macmullan@lewisbrisbois.com
*Counsel for Defendants*

DATED: November 27, 2023.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 27th day of November 2023, I electronically

filed a true and correct copy of the foregoing document with the Clerk of the Court

using CM/ECF, which will send an Electronic Mail notification of same to all

counsel of record.

Lewis Brisbois Bisgaard & Smith LLP

*/s/ Patrick C. Campbell*
Patrick C. Campbell (*pro hac vice*)
Alexander D. MacMullan (*pro hac vice*)
550 E. Swedesford Road, Suite 270
Wayne, Pennsylvania 19087
Telephone:   (215) 977-4077
Email: patrick.campbell@lewisbrisbois.com
alexander.macmullan@lewisbrisbois.com
*Attorneys for Defendants*

24